U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2017 AUG 25 AM 11: 22

CLERK

BY /s/ ktw
DEPUTY CLERK

| | |
|---|---|
| FELIPE ACCIOLY VIEIRA,<br><br>            *Plaintiff*,<br><br>v.<br><br>ANTHONY KORDA and<br>THE KORDA LAW FIRM<br><br>            *Defendants*. | Civil Action No. 2:17-cv-160 |

## COMPLAINT

Plaintiff, Felipe Accioly Vieira ("Plaintiff" or "Mr. Vieira"), by and through his attorneys, Barr Law Group, as and for his Complaint against Defendants, Anthony Korda and The Korda Law Firm (collectively referred to as the "Defendants"), hereby alleges and avers as follows:

## PARTIES

1. Plaintiff, Felipe Accioly Vieira, is an individual residing in the Town of Stowe, County of Lamoille, State of Vermont.

2. Upon information and belief, Defendant, Anthony Korda, is a resident of the City of Naples, County of Collier, State of Florida, and at all relevant times, was and is the President of The Korda Law Firm.

3. Upon information and belief, Defendant, The Korda Law Firm, is a Florida professional association incorporated under the name of Korda and Burgess, P.A., with its principal place of business located at 5621 Strand Boulevard, Suite 202, Naples, FL 34110.

4. Upon information and belief, The Korda Law Firm is a trade name and/or successor in interest to Korda, Zitt & Associates.



BARR LAW GROUP

Vermont
—
125 Mountain Road
Stowe, VT 05672

+1 802 253 6272 (t)
+1 802 253 6055 (f)

New York
—
100 Park Avenue
Suite 1600
New York, NY 10017

+1 212 486 3910 (t)
+1 212 486 7688 (f)

## JURISDICTION and VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

6. Venue is proper pursuant to 28 U.S.C § 1391(b)(2).

## FACTUAL ALLEGATIONS

7. Defendant, The Korda Law Firm, was and is a law firm engaged in the professional trade and business of providing legal services for fees.

8. Defendant Korda was engaged in the professional trade and business of providing legal services for fees as attorneys with Korda, Zitt & Associates (now The Korda Law Firm).

9. At all relevant times, Defendant Korda was actively involved in the management, business decisions, and marketing of The Korda Law Firm.

10. At all relevant times, the individual Defendants derived income and financial gain from fees collected from The Korda Law Firm's clients.

11. Defendants hold themselves out to be experienced EB-5 attorneys with a nationwide presence; as being recognized and/or awarded as "EB-5 verified" attorneys; and as touting a one-hundred (100) percent success rate for its clients in their EB-5 processes.

12. The EB-5 Immigrant Investor Program was created to stimulate the U.S. economy with capital investment from foreign investors. Under the program, foreign investors can receive a permanent visa to live and work in the U.S. if they make a capital investment that satisfies certain conditions over a two-year period, including the creation of jobs. The investments are typically administered by "regional centers" throughout the U.S. and limited partnerships managed by people other than the foreign investors.

13. Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in a "commercial enterprise" in the United States may petition the USCIS (called an "I-526

Petition") and receive conditional permanent residency status for a two-year period. The USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

14. The EB-5 Immigrant Investor Program requires a showing that the foreign investor "has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."

15. If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa and live and work in the United States permanently.

16. At all relevant times, Defendant Korda was and is not licensed to practice law in either Florida or Vermont.

17. In February of 2012, or thereabouts, after discussions with then-Jay Peak President and CEO, William Stenger, about investing in one of the many EB-5 projects at Jay Peak, Mr. Vieira requested a "list of attorneys" to retain for EB-5 related legal services.

18. Rather than providing a list, William Stenger directed Mr. Vieira to work with one specific immigration attorney, Anthony Korda.

19. Notably, Defendant Korda was an investor that received his permanent green card through investing in Phase I of the EB-5 projects at Jay Peak.

20. Defendant Korda explicitly assured Mr. Vieira that he would assist with the necessary due diligence and immigration suitability of the Jay Peak project, along with advice about projects and regional center claims of which to be wary.

21. On March 5, 2012, Mr. Vieira and Defendant Korda executed a fee agreement wherein Defendant Korda agreed to represent Mr. Vieira in connection with the EB-5 investment

and any applications related to the EB-5 Alien Entrepreneur program of the Jay Peak Hotel Suites Stateside, L.P. Project (Phase III-C) in Jay, Vermont, specifically including all necessary legal services to prepare and file Mr. Vieira's I-526 Petition.

22. One of the obligations required of an attorney retained to submit an I-526 Petition is to acquire and supply evidence that the chosen EB-5 investment project will create ten (10) full-time positions for qualifying employees. This ten (10) job mandate requires that immigrant investor money is appropriately spent by the EB-5 project to create the requisite jobs.

23. In February 2012, issues arising between the VRC and Rapid USA Visas – a third party EB-5 consulting company that referred prospective investors to Jay Peak.

24. Specifically, Rapid USA Visas claimed that it had lost confidence in the representations being made by Jay Peak regarding its EB-5 projects and how funds were appropriated.

25. Mr. Vieira confronted William Stenger about the rumors surrounding Rapid USA Visas' lack of confidence in Jay Peak's representations because it concerned him that the EB-5 consulting firm that introduced him to the VRC no longer wanted to do business with Jay Peak.

26. William Stenger downplayed the problems raised by Rapid USA Visas and told Mr. Vieira that the issues surrounding Rapid USA Visas and Jay Peak were merely due to a "business dispute."

27. Mr. Vieira was not satisfied with the explanation provided by William Stenger.

28. Accordingly, Mr. Vieira contacted James Candido – the then-Executive Director of the Vermont Regional Center – to gather information regarding the truthfulness of Jay Peak's representations.

29. After multiple emails to James Candido, he finally contacted Mr. Vieira by telephone, which was surprising as most of their communications had been through email. It appears that James Candido was making all efforts to avoid memorializing his representations to Mr. Vieira.

30. During the telephone conversation, James Candido reiterated Jay Peak's party-line that the issue between Jay Peak and Rapid USA Visas was merely a "business dispute."

31. On March 9, 2012, or thereabouts, Mr. Vieira expressed his concerns over investing in Jay Peak to Defendant Korda. However, after claiming that he had no information behind the fallout between Jay Peak and Rapid USA Visas, Defendant Korda placed the blame on Rapid USA Visas and deflected inquiry away from Jay Peak.

32. Specifically, Defendant Korda repeated the party-line for Jay Peak by claiming that the issues "may be no more than an attempt [by Rapid USA Visas] to be spiteful in light of a business fallout."

33. After discrediting Rapid USA Visas, in the same communication, Defendant Korda feigned objectivity by claiming that he would "work with any regional center project you like" and presented Seldon Technologies as another project in the VRC. However, just after discrediting Rapid USA Visas, Defendant Korda qualified this suggestion by informing Mr. Vieira that the Seldon project was put together by the organization he just discredited – Rapid USA Visas.

34. Instead of addressing Mr. Vieira's concerns regarding Jay Peak's expenditure of EB-5 investor money, Defendant Korda claimed that the "only weakness" was a lack of exit strategy for a return on investment. But Defendant Korda diminished that assessment by

highlighting his own involvement as an investor in Jay Peak – a sort of "we're in this together" assurance.

35. Further, on the same day, rather than investigating Mr. Vieira's concerns, Defendant Korda inundated Mr. Vieira with information about the EB-5 Immigrant Investor Program's enabling legislation sunsetting in October of 2012. Given the limited timeline, this put pressure on Mr. Vieira to invest in Jay Peak rather than investing in another EB-5 project.

36. During this time, in March of 2012, or thereabouts, Mr. Vieira was presented with an escrow agreement and offering documents for Jay Peak's Phase III-C EB-5 project.

37. Along with the offering documents came a "due diligence period" for Mr. Vieira to verify Jay Peak's representations and its EB-5 project requirements, including the requirement that it appropriately spent investor money in order to create ten (10) full-time jobs. The due diligence period was set to end on June 2, 2012, or thereabouts.

38. In contrast to Defendant Korda's prior representations and the legal duties generally held by an EB-5 immigration attorney, Defendant Korda completely failed to assist Mr. Vieira in the due diligence process, and conducted absolutely no due diligence despite being retained and paid by this immigrant-investor for a 1/2 million dollar investment.

39. Jay Peak did not provide any financial information on how EB-5 investor money was spent and, indeed, Defendant Korda never requested any.

40. William Stenger continued his pressure to obtain Mr. Vieira's subscription to the Jay Peak EB-5 project, and on or about May 21, 2012, a representative of Jay Peak forwarded the subscription agreement, an investor questionnaire, and wiring instructions for the prospective $540,000.00 investment.

41. Jay Peak still had not provided, and Defendant Korda still had not requested, financial or operational information. As a result, Mr. Vieira requested such information from Jay Peak, which sent him only the subscription agreement.

42. The Jay Peak representative forwarded Mr. Vieira's request for the operational information while editorializing that Mr. Vieira was a "P[ain] I[n] [the] A[ss]."

43. The Jay Peak representative accidentally included Mr. Vieira in her editorialized response.

44. In light of the lack of transparency, insult, and utter lack of disclosed information regarding the project, Mr. Vieira requested that Defendant Korda draft a letter aborting his investment in accordance with his escrow agreement.

45. However, in response to Mr. Vieira's concerns, Defendant Korda rushed to the defense of Jay Peak by explaining that they are "efficient and caring (if a little overwrought by the extra work that the break up with Rapid Visa led to)."

46. Additionally, Defendant Korda implored Mr. Vieira to have Korda "liaise" with William Stenger directly, making no mention of a desire to gather the information requested by Mr. Vieira. Further, by speculating that the parties needed to be wary of public disclosure of what actually occurred, Defendant Korda further defended Jay Peak in its "breakup" with Rapid USA Visas.

47. Defendant Korda may have spoken with William Stenger, but he did nothing to gather the documentary evidence necessary to address or inquire as to the legitimate prospects of an EB-5 investment in Jay Peak.

48. Subsequently, from May 25, 2012 through May 31, 2012, or thereabouts, in a false attempt to quell Mr. Vieira's concerns, William Stenger sent Mr. Vieira a flurry of

operational reports from Jay Peak – but still no financial information regarding the expenditure of EB-5 investor funds.

49. Defendant Korda's failure to assist in the due diligence period that was rapidly coming to a close on June 2, 2012, along with his warnings of the end of the EB-5 immigrant investor program in October of 2012, in conjunction with his continual defense of Jay Peak, caused Mr. Vieira to feel as though his opportunity to live the American dream was about to disappear if he did not execute the Jay Peak Phase III-C subscription agreement.

50. As a result of this pressure and the multiple failures by Defendant Korda, Mr. Vieira executed the subscription agreement to become a Phase III-C investor in Jay Peak on or about May 30, 2012.

51. However, months earlier, Defendant Korda was aware of the true nature of the issues with Jay Peak when it was revealed that Rapid USA Visas' allegations against Jay Peak were much more than just a "business dispute." Rapid USA Visas suspected Jay Peak of misappropriating EB-5 investors' money when Jay Peak repeatedly refused to verify how investors' funds were being used.

52. Specifically, in February of 2012, or thereabouts, when Rapid USA Visas sent a letter to approximately a hundred (100) immigration attorneys for Jay Peak Phase I investors expressing its grave concerns about the misappropriation of EB-5 investor funds and suspected fraud by Jay Peak.

53. As previously stated, Defendant Korda is a Jay Peak Phase I investor.

54. Thus, contrary to his claims of ignorance to Mr. Vieira, Defendant Korda knew, or should have known, of the nature of the dispute between Rapid USA Visas and Jay Peak.

55. Defendant Korda failed in his obligations and loyalty to Mr. Vieira because he had knowledge of the nature of the dispute between Rapid USA Visas and Jay Peak, yet failed to acquire documentary evidence of the expenditure of EB-5 investor funds during his representation of Mr. Vieira.

56. Not even a month after Mr. Vieira subscribed to Jay Peak did these failures begin to come to light. Specifically, on or about June 28, 2012, Defendant Korda informed Mr. Vieira of more issues with the Jay Peak EB-5 projects and an associated delay in the submission of his I-526 Petition. Unsurprisingly, these issues involved federal government inquiries into the expenditure of EB-5 investor funds and related job creation.

57. Subsequently, in April 2016, or thereabouts, the mounting suspicions raised by Mr. Vieira and Rapid USA Visas were confirmed when the United States Securities and Exchange Commission filed a securities fraud lawsuit against Jay Peak developers, Ariel Quiros and William Stenger, involving the misappropriation of EB-5 investor funds.

58. Because of Defendant Korda's wrongdoing, deceit, omissions, and failures to follow through on his attorney obligations, along with his overall disloyalty, Mr. Vieira never received the proper documentation verifying how EB-5 investors' funds were being used at Jay Peak.

59. But for Defendant Korda's wrongdoing, deceit, omissions, and failures to follow through on his attorney obligations, along with his overall disloyalty, Mr. Vieira would not have subscribed to Jay Peak as a Phase III-C investor.

60. Because of Defendant Korda's wrongdoing, deceit, omissions and failures to follow through on his attorney obligations, along with his overall disloyalty, Defendants

wrongfully benefitted themselves at Mr. Vieira's expense, and wrongfully retained client funds that had not been earned.

## CAUSES OF ACTION

### COUNT I

*Malpractice (Against All Defendants)*

61. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 60 of the Complaint, inclusive.

62. At all relevant times, the Defendants owed Mr. Vieira a duty of care arising from the attorney-client relationship.

63. By the Defendants' representations, Defendants owed Mr. Vieira a duty of care to exercise professional skill commensurate with Defendants' expertise and superior legal skill, knowledge, and ethical standards.

64. In the course of the representation of Mr. Vieira, Defendants breached their duties to Mr. Vieira by failing to exercise reasonable care and skill in handling Mr. Vieira's case.

65. In the course of the representation of Mr. Vieira, Defendants breached their duty to Mr. Vieira by failing to exercise the care and skill expected of specialized attorneys (as represented by Defendants).

66. In the course of the representation of Mr. Vieira, Defendants breached their duty to Mr. Vieira by intentionally and continually failing to abide by Mr. Vieira's lawful instructions and requests, and by taking actions contrary to Mr. Vieira's interests.

67. In the course of the representation of Mr. Vieira, Defendants breached the duty of care owed to Mr. Vieira by actively committing and condoning multiple violations of the

Case 2:17-cv-00160-jmc Document 1 Filed 08/25/17 Page 11 of 19

Vermont Rules of Professional Conduct, most notably practicing law in Vermont without a license.

68. As a proximate cause of Defendants' breaches and wrongdoing, Mr. Vieira suffered and continues to suffer harm and damages, including special damages as to his reputation in an amount to be determined at trial.

## COUNT II

### *Breach of Contract (Against All Defendants)*

69. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 68 of the Complaint, inclusive.

70. In the representation of Mr. Vieira, Defendants agreed to bill Mr. Vieira and retain payment for legal services performed on Mr. Vieira's behalf.

71. In the representation of Mr. Vieira, Defendants billed Mr. Vieira and retained payments from Mr. Vieira for legal services that were not performed and for services that were falsely represented to have been performed.

72. For good and valuable consideration, Defendants agreed to provide legal services on Mr. Vieira's behalf and for Mr. Vieira's benefit in relation to the I-526 Petition and its associated due diligence.

73. Defendants breached the contract with Mr. Vieira by failing to provide legal services that were contracted for and by falsely representing those services.

74. As a consequence of Defendants' breach, Mr. Vieira suffered and continues to suffer harm and damages in an amount to be determined at trial.

## COUNT III

### *Breach of Good Faith and Fair Dealing (Against All Defendants)*

75. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 74 of the Complaint, inclusive.

76. At all relevant times, the parties were bound to execute their agreement for representation and legal services consistent with the covenant of good faith and fair dealing.

77. Mr. Vieira expended money and resources to both pay and assist Defendants in their representation, according to the requests of Defendants, and the necessity of preparing Mr. Vieira's I-526 Petition and its associated due diligence.

78. Mr. Vieira reasonably expected that the money and expenditure of time and resources were being used by Defendants to prepare Mr. Vieira's I-526 Petition and its associated due diligence.

79. In fact, Mr. Vieira's money, time, and resources were not being used for the preparation of Mr. Vieira's I-526 Petition and its associated due diligence, and worse, Mr. Vieira's money, time, and resources were being funneled to a sham representation filled with false efforts, false information, and the fraudulent appearance of responsive representation.

80. As a consequence of Defendants' wrongful acts and conduct, Mr. Vieira has suffered and continues to suffer harm and damages, and Defendants have been and continue to be unjustly enriched.

## COUNT IV

### *Quantum Meruit/Unjust Enrichment (Against All Defendants)*

81. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 80 of the Complaint, inclusive.

82. Defendants billed Mr. Vieira for legal services that were not performed.

83. Mr. Vieira paid money to Defendants for legal services that were not performed, and Defendants accepted those payments.

84. As a consequence of Defendants' wrongful acts and conduct, Mr. Vieira has suffered and continues to suffer harm and damages, and Defendants have been and continue to be unjustly enriched.

### COUNT V

### *Violation of Section 10(b) and Rule 10b-5 (Against All Defendants)*

85. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 84 of the Complaint, inclusive.

86. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

87. The EB-5 investments are securities under the meaning of Exchange Act.

88. Defendant Korda is not a registered broker of securities.

89. The Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading to Plaintiff. The purpose and effect of this scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff to subscribe and invest in the Jay Peak Phase III-C Project.

90. The Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly, and recklessly issued, caused to be issued, participated in the issuance of, the

preparation and issuance of deceptive and materially false and misleading statements to Plaintiff as particularized above.

91. When they made false statements and committed their omissions, the Defendants knew facts or had access to information suggesting that their public statements were not accurate or recklessly failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

92. The Defendants were motivated to commit wrongful acts by the receipt of lucrative fees from investors who became legal clients, as well as monetary compensation and benefits conferred upon Korda by the Jay Peak entities.

93. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff relied, to his detriment, on such misleading statements and omissions in purchasing limited partnership interests in the Jay Peak projects. Plaintiff has suffered substantial damages as a result of the wrongs alleged herein.

94. Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

14

    c. engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

95. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

96. By reason of the foregoing, the Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff in connection with his investment in the Jay Peak Phase III-C Project.

97. As a result, Mr. Vieira suffered and continues to suffer harm and damages.

## COUNT VI

*Consumer Fraud – Unfair and Deceptive Acts & Violation of the Consumer Fraud Act – 9 V.S.A. §§ 2451, et al. (Against All Defendants)*

98. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 97 of the Complaint, inclusive.

99. Defendants made misrepresentations, concealed information, and engaged in unfair practices that were likely to mislead and, in fact, did mislead Mr. Vieira with regard to the services of state oversight, administration, management, and overall regulation of the Jay Peak Phase III-C Project.

100. Specifically, in order to induce Mr. Vieira to avail himself of the Jay Peak projects and to induce representation in exchange for fees, Defendants represented that the Phase III-C

project was one of the best in United States and that Korda would represent Mr. Vieira's investment interests.

101. Mr. Vieira reasonably interpreted the Defendant's misrepresentations in this regard, and paid fees and made his investment to the benefit of Korda and to Mr. Vieira's own detriment.

102. The misleading effect of Defendants' misrepresentations, willful omissions, or fraudulent practices were material because they affected Mr. Vieira's decision to select Korda and the Jay Peak Phase III-C Project as a sound investment in reliance upon the representations of Korda.

103. The Defendants' misrepresentations, willful omissions, or fraudulent practices were made with wanton disregard for the rights of Mr. Vieira.

104. As a result, Mr. Vieira suffered and continues to suffer harm and damages.

## COUNT VII

### *Breach of Fiduciary Duty (Against All Defendants)*

105. Mr. Vieira re-alleges and incorporates herein by reference the allegations of Paragraphs 1 through 104 of the Complaint, inclusive.

106. As Mr. Vieira's attorneys, Defendants acted in a fiduciary capacity in relation to Mr. Vieira and his interests.

107. In their legal representation of Mr. Vieira, Defendants were required execute their fiduciary duties by acting in good faith and with loyalty for the advancement of Mr. Vieira's interests, and with the care of an ordinarily prudent person in a like position would exercise under similar circumstances.

108. Defendants had a duty to avoid conflicts of interest that may have impaired Defendants' ability to exercise independent professional judgment on behalf of Mr. Vieira.

109. Defendants had a corresponding duty to disclose potential conflicts to Mr. Vieira, and to obtain informed consent for continuation of the representation in light of those potential conflicts.

110. Defendants had a corresponding duty to represent the Mr. Vieira without allowing potential conflicts to impair or affect Defendants' prudent judgment and proper representation of Mr. Vieira.

111. Defendants breached their fiduciary duties because they failed to act in good faith, failed to act with loyalty in the advancement of Mr. Vieira's interests, and failed to act with the care of an ordinarily prudent person in a like position would exercise under similar circumstances by funneling Mr. Vieira's money, time, and resources into a sham representation filled with false efforts, false information, and the fraudulent appearance of responsive representation.

112. Defendants breached their fiduciary duties because they failed to act in good faith, failed to act with loyalty in the advancement of Mr. Vieira's interests, and failed to act with the care of an ordinarily prudent person in a like position would exercise under similar circumstances by intentionally and continually failing to abide by Mr. Vieira's lawful instructions and requests, and by taking actions contrary to Mr. Vieira's interests.

113. Defendants breached their fiduciary duties because they failed to avoid conflicts of interest, failed to disclose conflicts of interest, and allowed conflicts of interest to affect their prudent judgment and representation of Mr. Vieira.

114. Specifically, Defendants have breached their fiduciary duties by failing to disclose and investigate all material and necessary facts to Mr. Vieira prior to Mr. Vieira's investment in the Jay Peak Phase III-C project.

115. But for Defendants' wrongful acts and conduct, Mr. Vieira would not have invested in the Jay Peak Phase III-C project.

116. As a consequence of Defendants' wrongful acts and conduct, Mr. Vieira has suffered and continues to suffer harm and damages.

WHEREFORE, Plaintiffs respectfully requests the following relief:

1. Entry of judgment for Plaintiff;

2. Compensatory, consequential, and general damages in an amount to be determined at trial;

3. Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

4. Punitive damages for each claim to the maximum extent available under law on account of the outrageous nature of Defendants' willful and wanton disregard for Plaintiff's rights;

5. Award treble damages under 9 V.S.A. §§ 2453 and 2461 in an amount to be determined at trial;

6. Costs and disbursements of the action;

7. Pre- and post-judgment interest;

8. Reasonable attorneys' fees; and

9. Total damages in excess of $2,000,000.00, and such other relief as this Court deems just and proper

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: August 22, 2017
Stowe, Vermont

Respectfully Submitted,

Barr Law Group

By:_____
Russell D. Barr
125 Mountain Road
Stowe, VT 05672
Phone: 802.253.6272
Fax: 802.253.6055
Email: russ@barrlaw.com

By:_____
Chandler W. Matson
125 Mountain Road
Stowe, VT 05672
Phone: 802.253.6272
Fax: 802.253.6055
Email: chandler@barrlaw.com

*Attorneys for Plaintiff Felipe Accioly Vieira*